McDermott *v.* Board of Police of Metropolitan Police District.

———o-O-o———

25 635
71h 87

25b 635
33ap478

25b 635
52ad330

25b 635
166a 177

## McDERMOTT *vs.* THE BOARD OF POLICE FOR THE METROPOLITAN POLICE DISTRICT.

Under and by virtue of section 32 of the Metropolitan Police Act, (*Laws of 1857, ch.* 569,) the policemen in office in the city of New York on the 22d of April, 1857 became the policemen under that act, and held office, and were bound to do duty as such.

The legislature intended, as to the police force then existing and made part of the force organized by the Metropolitan Police Act, to preserve the same inviolability in regard to the tenure of their office, which was secured to them by the act of 1853.

And in passing and adopting the rules and regulations for the trial and removal from office of policemen, authorized by the 7th section of the Metropolitan Police Act, the board of police but carried into effect the intention of the legislature, to secure a fair trial, on full notice, to every member of the police force against whom charges should be preferred.

The rules thus adopted are in conformity with the constitution and laws of this state. And being adopted in conformity with, and in pursuance of, the power conferred on the board by law, their effect is the same as if they had been enacted by the legislature.

Those rules having provided that all charges preferred against any member of the police force, unless preferred by one of the commissioners, &c. must be verified by the complainant and must state his name and residence; *it was held* that a member of the force could not be removed upon charges not conforming to such regulations; and that in order to sustain a removal, it must appear either that the charges were preferred by a commissioner, &c. or that they were verified, and stated the name and residence of the complainant.

A member of the police force cannot be legally removed from office unless he has been personally notified of the charges preferred, and unless, if he denies them, he has had personal notice of the time and place of trial.

McDermott *v.* Board of Police of Metropolitan Police District.

Where the legislature direct the giving of notice, as a condition precedent to
the doing of an act, they may also prescribe the mode of giving notice; but
in the absence of any provision on that subject, *personal service* of notice is
necessary.

Unless the person proceeded against is duly notified according to law, the tri-
bunal, court or officer has no jurisdiction over him, and the proceedings are
*coram non judice.*

MOTION for an injunction. The complaint, which was filed
by the plaintiff, as well on his own behalf as on behalf of
all others similarly situated, alleged that the plaintiff was a
tax-payer in the city of New York, the owner of real estate
therein, and, as such, was liable to be assessed and compelled
to pay taxes for the support and maintenance of the police of
said city; that by law and the action of the board of supervi-
sors, the number of policemen for the city and county of New
York is limited to 1270; that the board of police, organized un-
der the act of April 15, 1857, had appointed more than 850 po-
licemen; and that there are now in said city, ready and willing
to do their duty as policemen, more than 500 who were policemen
at the time of the passage of that act, and who have never been
removed in accordance with its provisions. The plaintiff further
alleged that he was duly appointed a policeman on the 18th of
January, 1857; that he was doing duty as such at the time of
the passage of the act of April 15, 1857; and that in May or
June last the said board of police attempted to remove him from
his office of policeman; that such removal was made without
written charges being preferred against him, or any opportunity
being given him to be heard in his defense; that on the 9th of
October last the said board of police adopted a resolution in the
words following:

" *Resolved,* That such of the old police force as have not been
dismissed from the police in conformity to law, be, and they are
hereby declared to be, of the metropolitan police of this city, and
entitled to do duty and to be paid as such."

That after the adoption of that resolution, another was adopted
by said board, as follows:

" *Resolved,* That a committee be appointed to hear and report

McDermott *v.* Board of Police of Metropolitan Police District.

to the board the claims of members of the discharged police to be restored to duty."

That a committee was appointed by said board in conformity with said resolution; that they had taken testimony and heard the applications of several policemen to be restored to duty, but had not reported them to the board. The plaintiff further alleged that notwithstanding the number of policemen in office was greater than the number allowed by law, the said board of police were proceeding to appoint additional policemen, thereby creating an illegal charge upon the property of the plaintiff and other tax-payers. The plaintiff thereupon demanded judgment that he was a member of the metropolitan police, and as such entitled to pay, and that it might be declared that the number of policemen now in office were all that the law allowed to be appointed, and that said board be restrained from appointing a greater number, or any additional number of policemen, beyond that authorized by law.

The defendants showed by affidavits in opposition, that the board of police organized under the act on the 22d of April, 1857; (and it was conceded on the argument that at that time the number of the police was 1270;) that a large portion of said police force did not elect to come in and do duty under that law; that previous to its passage the police force of the city of New York was under the direction of and appointed by a board of police, consisting of the mayor of the said city, the recorder and city judge; and that all of said police force except 351 adhered to that organization, and refused to recognize or do duty under the board of the defendants. That the plaintiff, though doing duty under the present organization, had never been legally appointed, the recorder not being present at the meeting. That the plaintiff and a large number of the police in office, on the 22d of April, 1857, were, on the 13th of June last, charged with willful disobedience of orders, by written charges preferred by a sergeant of police, and the said charges, with a notice that the said board would proceed to hear and determine the same, on the 22d of June following, were made up and addressed to the plaintiff; that on the last named day evidence was given under oath

to the board of police that said charges and summons and notifications had been served on the plaintiff; that on the 22d of June, on due proof that the plaintiff had willfully disobeyed the order of the board of police, he was adjudged guilty of the charge and dismissed from the service. That in reference to all the other members of the police force in office at the time of the passage of the act of April 15, with the exception of 351, they continued to act in hostility to the defendants, and in consequence of their neglect and refusal to do duty as directed by them, said board had taken proceedings similar to the proceedings aforesaid against the plaintiff, by which they were all declared and adjudged, prior to July 3, 1857, to be removed. It also appeared by affidavits that the present police force doing duty under the defendants is 961, of which number 354 are of the police force existing on the 15th April, 1857, and the residue, 610, new appointments. That a copy of the charges preferred against the plaintiff, and notice of trial, were served upon him personally two days before the time fixed for his trial; and that the board of police had adopted rules and regulations for their government in pursuance of the power conferred upon them by statute. They provide for the holding of regular meetings of the board of police on Tuesdays and Fridays of each week. That all charges preferred against any member of the police force must be in writing and sworn to or affirmed with the name and residence of the complainant. But that charges may be preferred by either of the commissioners, general or deputy superintendents, or inspector, simply in writing. That when charges are filed, it is made the duty of the chief clerk to notify the person complained of to call and examine the charges, and the trial thereof shall be in order at any subsequent meeting of the board, of which the person complained of shall be advised. That no person complained of shall be heard by any commissioner apart from the meeting of the board, it being the sense of each member of the board that his duties are *quasi judicial*, and that general justice demands that all matters of suspension or removal should be heard only at regular meetings.

McDermott *v.* Board of Police of Metropolitan Police District.

*W. R. Stafford, H. L. Clinton* and *G. Dean,* for the plaintiff.

*A. J. Vanderpoel, D. D. Field* and *Wm. Curtis Noyes,* for the defendants.

DAVIES, J.  By chapter 392 of the laws of 1846, the watch department of the city of New York and various other offices were abolished, and a police force for said city organized.  By this act, as amended by chapter 436 of the laws of 1849, the officers and policemen were to be appointed by the mayor on the nomination of the alderman and assistant of each ward in the city, and to hold office for the term of four years, unless sooner removed.  By section four of that act as thus amended, the mayor was to receive complaints for cause against any member of the police force, and he was to cause notice thereof to be given to the accused, " to afford him an opportunity to be heard in his defense."

It cannot have been forgotten that frequent and loud complaints were made against this system.  It was alleged that the captains of police and policemen deriving, as they did in fact, their offices from the aldermen and assistants of the various wards, partook of their political affinities, and necessarily felt called upon to sustain them, and promote the political aspirations of those to whom they were indebted for their places.  It is unnecessary to inquire whether there was or not, any truth in these charges, but it may be safely assumed from the character of a large number of the police, that in truth there was no foundation for them.  Nevertheless, they did not fail to make an impression upon the public mind, and materially tended to weaken confidence in the police and deprive them of that independent position so essential to their own self respect and usefulness in the discharge of their important duties.  This and other considerations which might be adverted to, led to the passage of the act of April 13, 1853, (chapter 223.)  That act provided for a radical change in the organization of the police.  By section one of article three it was provided that the mayor, recorder and city judge should constitute a board of commissioners for the trial

and appointment of all members of the police, and that they should have the general regulation and control of the department. It also provided that members of the police force appointed after that act went into operation, "should hold their offices during good behavior, and should only be removed for cause, as thereinafter provided." Section four of that article provided that the mayor might receive from any person complaints for cause against any member of the department, "and in each case notice to the accused shall be given to afford him an opportunity to be heard in his defense." It was also provided that the accused party might in all cases appear by counsel, and might compel the attendance of witnesses in his behalf. The testimony in each case was to be reduced to writing, and the decision of the board thereon, and filed with the clerk of the common council. It is thus seen that the legislature threw every guard around the policemen necessary to insure to them a fair trial on all charges preferred, full opportunity of making their defense, and a public record of their conviction or acquittal. And all these precautions were manifestly wise and necessary. It was the great object of this law to place the police force entirely above and beyond all partisan or other illegitimate influence. They were assured that if they devoted themselves faithfully to their duty, they should hold their offices so long as they thus well conducted; that no arbitrary or partisan influences should interfere with them; but that the tenure of their office was made as secure and permanent as that of the judges in the highest courts of this and other countries. The legislature declared that if they took office under this act, they should only be deprived of it for cause, and after a full, fair and public trial.

While this law thus existed, and with their rights thus secured and guarded, the legislature of this state at its late session passed the act organizing the metropolitan police district and the police therein. The counties of New York, Kings, Westchester and Richmond were constituted the district, and the police thereof were placed under the control of a board of five commissioners, together with the mayors of the cities of New York and Brooklyn.

McDermott v. Board of Police of Metropolitan Police District.

I cannot be mistaken, I think, in assuming that it was the avowed intent of the framers and promoters of this act and of the legislature who passed it, more effectually to carry out the benign and wise purposes intended to be secured by the act of 1853, namely, to secure to the metropolis of the state, and the surrounding neighborhood, an efficient, able and independent police, subject to no undue influence, and intent only on the discharge of the onerous, delicate and important duties resting on them. I think this intent is fairly deducible from the tenor of the act, even if we make no reference to the reports in favor of this law, or the debates had on its passage. Such reference fully sustains these views. It is quite clear to my mind that the legislature did not intend by the passage of this act to introduce any violent changes, or deprive those then in office of the rights secured to them by the act of 1853, so long as they faithfully discharged their duties. This is apparent from the absorption into the metropolitan police of the police force then existing in the cities of New York and Brooklyn. By section 32 of this act it is declared that "the police in the cities of New York and Brooklyn, officers and patrolmen, shall continue to do duty under existing laws at the passage of this act, and according to the regulations of the departments of New York and Brooklyn, until after the first meeting of the board of police under this act (this was held on the 22d of April, 1857,) when the said police *shall hold office* and *do duty* under the provisions of the act hereby enacted, *and as members of the police force* of the metropolitan police district hereby constituted." Nothing could be more plain, therefore, than that the 1270 policemen in office in the city of New York on the 22d of April last became the policemen under the metropolitan police act, and held office and were bound to do duty as such.

Section 6 of said act declares that the board of supervisors of the county of New York were to determine the number of patrolmen for said county, and that said board might "from time to time increase or diminish the number of patrolmen." And until otherwise provided, that is, until some other or further action of the said board of supervisors, the quota of patrol force

for the city and county of New York shall be the number now existing by law in said city.   That number we have seen was 1270, and on the 18th of May last the board of supervisors of the county of New York authorized the board of police to appoint five policemen.   This must be taken as an authority to appoint that number in addition to the quota then authorized by law.   It canot be assumed that the supervisors, in the absence of plain language to that effect, intended to reduce the number of the whole police force for this city to five.   It was conceded by counsel on both sides, on the argument, that this resolution authorized the appointment of five additional policemen, making the whole number of the police force for this county, therefore, 1275.

It seems to me that it is undeniable that the legislature intended, as to the police force then existing and made part of the force organized by this act, to preserve the same inviolability as to the tenure of their office as was secured to them by the act of 1853.   The 7th section of this act declares that no person shall be removed from office in the police force, "except upon written charges preferred against him to the board of police, and after an opportunity shall have been afforded to him of being heard in his defense."

And so carefully has the legislature guarded and hemmed in the power of the commissioners to make removals, and, although they have required by the 7th section new and additional qualifications for those this board might thereafter appoint not exacted from or required of those policemen then in office, yet by section 33 of the act it was deemed necessary to give specific power to the board of police to remove from office any one of the [then] present members of the police department of New York not possessed of the qualifications required of new members, but it was also declared in the same section, that in making such removals the board " shall proceed in the manner prescribed in the 7th section of this act."   It becomes necessary to ascertain, therefore, the manner of removal thus prescribed.   And if we are to determine whether any removals made are legal and such as to deprive the person removed of his office, we must see if the manner thus prescribed has been followed.   If it has not, it

McDermott *v.* Board of Police of Metropolitan Police District.

needs no authority or illustration to sustain the position that such removal has not taken place, in legal effect. This section 7 authorizes and directs the board of police to define and prescribe by rules and regulations, in accordance with the constitution and laws of the state, the mode of trial and removal from office of each officer of the police force ; and the limitation upon these rules we have already seen in reference to removals is that no person shall be removed, except upon written charges preferred against him to the board of police, and after an opportunity shall have been afforded him of being heard in his own defense.

That the board of police, in adopting the rules and regulations before referred to, in pursuance of the authority thus conferred, correctly understood the language of the section, is manifest. They also correctly understood and gave full effect to a great principle, which lies behind and beyond all constitutions, laws, rules and regulations, that no man is to be deprived of any rights secured to him by law, without due notice of the charge or offense of which he is accused, and an opportunity given him of being heard in his defense.

The board of police, it seems to me, in passing and adopting these rules and regulations, but carried into effect the intention of the legislature, to secure a fair trial on full notice to every member of the police force against whom charges should be pre-ferred, and that the rules thus adopted are in conformity with the constitution and laws of this state. Being thus adopted in conformity with and in pursuance of the power conferred on the board by law, the effect of them is the same as if they had been enacted by the state legislature. (*Brick Church* v. *Mayor of New York*, 5 *Cowen*, 586.) Chief Justice Savage, in delivering the opinion of the court in that case, said, at page 51 : "It [the by-law] is expressly authorized by the act of the legislature, and whether it be their act or an act of the local city legislature makes no difference." The supreme court of this state, in the case of *Stuyvesant* v. *The Mayor*, (7 *Cowen*, 694,) referring to this case, said : " We have said in relation to this very by-law, that it was equivalent in this respect to an act of the legislature."

These by-laws, rules and regulations of the board of police,

for the trial and removal from office of policemen, being expressly authorized by the legislature, and being in conformity with the power conferred, have the same force and significance as though they were enacted by the legislature.

It is a well settled principle, that when any act is required to be done, to divest a man of property, or of any rights, and such act or proceeding be omitted, the act is void—as if a statute require a notice previous to a sale, it must be given, or the sale is void. (*Sharp* v. *Johnson,* 4 *Hill,* 92.) So if it requires *an affidavit* of the collector, of his inability to collect a tax preliminary to the sale, and the affidavit is not made, the sale is void without it. (*Id.*) So, also, if it requires a notice to the owners before land is taken, that they will be treated with respecting their damages, the whole proceeding is void without such notice be actually given. (*Id. See also Early* v. *Doe,* 16 *How.* 610.)

The board of police having required, therefore, by the by-laws, that all charges preferred against any member of the police force, unless preferred by one of the commissioners, general or deputy superintendents, or one of the inspectors, must be sworn or affirmed to, with the name and residence of the complainant, and it appearing that the charges against the plaintiff were not presented by a commissioner, general or deputy superintendent, or an inspector, it becomes necessary to show that they were under oath, and state the name and residence of the complainant. I am unable to perceive, upon principle or authority, how the person accused could be called on to answer if the charges were not preferred in accordance with the laws and the rules and regulations. These were made as well for the government of the board as the protection of the party accused. He could not be called on to defend himself from charges not preferred in conformity with the rules and regulations, and if he was removed without any waiver on his part or appearance by him, without the requisites being complied with, on the authority of the cases above cited such removal and all proceedings consequent thereon would be void.

The defendants state in their affidavits that all the proceedings taken for the removal of the 929 members of the police

force in office on the 22d of April, 1857, were similar to the proceedings taken against the plaintiff. If, on investigation, that shall be ascertained to be so, like consequences will result in regard to them, as follow, from the attempted removal of the plaintiff.

But it seems to me that a more formidable objection to the removal of the plaintiff, and those against whom similar proceedings have been had, remains to be considered. The statutes we have seen most peremptorily declare that no person shall be removed except upon written charges preferred against him, and an opportunity being afforded him of being heard in his defense. No one can mistake the meaning and intent of this provision. Clearly they are, that the party charged shall know whereof he is accused, and that he shall have the opportunity of defending himself. To carry out these objects of the legislature, he must have notice or knowledge of the charges, and notice or knowledge of the time and place of trial, to rebut and disprove them if he desires to do so. So obvious is this that it certainly needs no authority or argument to sustain the position. Such were the legislative directions under the act of 1853, and it was conceded on the argument that such had been the practice of the board in executing their duties under that act. And such, it seems to me, was clearly the understanding of the board of police, when they framed their rules and regulations. For they have provided that the party complained of shall have written notice to call and examine the charges preferred against him, thereby clearly contemplating that he should have personal knowledge of them. He was to have the opportunity of answering the same by either an admission or denial; and, in the event of a denial he was to be advised or notified of the time of trial, which was to take place at some subsequent meeting of the board.

It is alleged in the complaint in this cause, and not denied by the affidavits in opposition, except as to the plaintiff, that he and more than 500 of the police force in office on the 22d of April last have been removed without any personal notice to them of the charges preferred, or any personal notice of the time and place where they were to be heard in their defense. Was such

personal notice necessary to constitute a legal and valid removal? It seems to me, from the considerations already suggested, that the legislature so intended; that the board of police so understood their duty; and that the policemen, from the act of the legislature, the uniform practice under the act of 1853, and the rules and regulations of the board of police, so understood it and had a right so to understand it. And such is the well known and long established rule of law applicable to the point under consideration.

It is competent for the legislature to prescribe the mode and manner of giving notice, where they require as a condition precedent to the doing of an act that notice shall be given. The legislature has the power to say in a given case that the notice may be given by publication, or by leaving it at the place of business or dwelling house, or last place of abode of the party to be notified. But it is equally well settled that in the absence of any such legislative provision, whenever the legislature require notice to be given it must be *personal* notice. The tribunal, court or officer instituting proceedings has no jurisdiction, over the person proceeded against, unless duly notified according to law. The proceedings, in the absence of such notice, are all *coram non judice.* That in the absence of any legislative provision for substituted service, personal service of notice is in all cases required, is expressly held by the supreme court of this state in the case of *Rathbun* v. *Acker,* (18 *Barb.* 393.) In that case an ordinance was passed by the trustees of a village, requiring among other things a man by the name of Hewes, who lived in an adjoining town, to pave and grade and lay a side walk in front of three lots owned by him in the village. The ordinance was published in the village newspapers for three months. In five days after its passage, notice was sent to Hewes through the post office, which he received two days after, stating that an ordinance had been passed, and that he would see it by reference to the newspaper, and that he was thereby required to flag, &c. in front of his three lots in ninety days from that date. The court say : " Was this notice served in contemplation of the statute, and if so, was it sufficient? The statute is, if the owner

neglects or refuses to construct the side-walk for ninety days after notice thereof to be served on such owner, or his or her agent, &c. The service here intended is personal service. When a statute requires service on a person, *it means personal service,* unless some other service is specified or indicated. There was no *personal* service in this case on Hewes or his agent. I also think the notice was insufficient, but it is not necessary to consider this." A case where this question seems to have been carefully considered arose in North Carolina, under the act prohibiting free negroes from residing within that state. It is the case of the *State* v. *Samuel Jacobs, a free negro,* and is reported in 2 *Jones' Law R.* 52. The 65th section of the 111th chapter of the revised statutes of that state declares that " It shall not be lawful for any free negro or mulatto to migrate into this state, and if he or she shall do so contrary to the provisions of this act, and being thereof informed, shall not within twenty days thereafter remove out of this state, he or she being thereof convicted, &c. shall be liable to a penalty of $500." The county court of Richmond, at January term, 1851, made an order that the sheriff of said county leave a written notice at the respective dwelling houses of Samuel Jacobs, (and thirteen other persons,) informing said persons that representations had been made to the court that they were colored persons and had come into that state contrary to law, and that unless they left the state within twenty days from the date of the notice, they would be proceeded against according to the act of the assembly. At the next term of the court, in April, 1851, the sheriff returned on the order that he had executed the law, by leaving copies thereof at the dwelling houses, &c. of the persons named. The county court held the service sufficient, but on appeal to the supreme court they reversed the judgment, and in giving their opinion say, " We think it is clear that the legislature intended that the *information* which it directed should be given to an immigrating negro should be communicated to him *personally* in words or by writing. The act is a highly penal one, and must therefore be construed strictly. The proper meaning of the verb to inform, in this connection, is to make known to by word or writing. That

this information was intended to be made to the party in person is evident from the fact that so short a time as twenty days only was allowed for acting upon it. The time is short, very short, even if, upon receiving personal notice, he has the whole of it for the purpose of making his preparations for removal. The leaving the notice at his house presupposes that he is not there to receive it in person. He may be absent from home, industriously engaged at work for some employer, or he may be on a journey on some lawful errand to a distant part of the same or to an adjoining county, and may not return until the greater part, if not the whole, of the twenty days has expired. Would it be just that he should suffer so heavy a penalty for not having known or acted upon a notice which had been left at his house twenty days before? *It cannot be so.*"

These considerations apply with great force and propriety to the question now under consideration. These policemen, many of them, had held office ever since the organization of the police force in this city; performed laborious, arduous, difficult and dangerous duties for a series of years without fault or accusation; and the legislature, which changed the governing head of this force, declare that they shall not be removed unless in the manner pointed out by the act and the rules and regulations of the board. Had they not a right to presume that they would not be removed without personal notice to them? It is not denied that such personal notice was given only in a few instances; and the necessity of its being given in all cannot be better enforced than by the reasoning of the supreme court of North Carolina, in the case above cited. A similar principle was recognized in the case of *Graham* v. *Sackett,* (6 *B. Mon.* 146.) The county court of one of the counties in Kentucky removed a jailer without notice to him. An appeal was taken to the court of appeals, and they reversed the judgment and action of the inferior court, and held that it was a fundamental principle recognized in all civilized countries that no man could be proceeded against without notice, and that *personal* unless a different mode of service was prescribed. At page 161 the court says: "It has never been doubted that it [the power of removal] was a judicial

power, and although no statute has prescribed the mode of proceeding in which the power is to be exercised, the court, in obedience to the great principle pervading every enlightened system of jurisprudence, which prescribes that the individual whose rights are to be affected by a judicial act involving the ascertainment of facts against him, shall have an opportunity of defense, has uniformly required regular charges and specifications pointing out the supposed breaches of good behavior, and has been careful that the accused should have *full* opportunity of making defense." At page 168 the court says, "That whatever informality may, in the absence of special regulation be allowable in the mode of its exercise, no order or judgment can be valid, unless the record shows that the jailer has had an opportunity of being heard in his defense, and that the court has adjudged him guilty of neglect or breach of duty."

It seems to me, therefore, undeniable and beyond all controversy that no members of the police force, doing duty as such, and by the act made members of the metropolitan police, have been legally removed from office unless the charges have been made under oath when not preferred by a commissioner, general or deputy superintendent, or an inspector, stating the name and residence of the complainant, and unless the party complained of has been personally notified of the charges preferred, and if he made denial of them, had personal notice of the time and place of trial. After the most careful consideration which I have been able to give to this case, I have a clear conviction that these conclusions are sound and sustained by principle and authority.

But it was argued before me with great earnestness and ability by the counsel for the board of police, that the plaintiff and the others who have been removed, never were members of the metropolitan police, had never submitted themselves to the jurisdiction of the board of police, and that consequently, they have none of the rights or privileges of a policeman. The answer to this argument seems to be conclusive, that the legislature, who had the power, declared that they were members of

the metropolitan police, and should do duty therein as such, and should only be removed therefrom in the manner already alluded to and discussed.   Another answer is, the board of police has recognized them as such by issuing orders to them, entertaining charges against them, and proceeding to their trial and removal.   That they were subject to the jurisdiction and control of the board of police, I have no doubt.   That they were bound to obey all the lawful orders of the board is equally beyond question, and if they did not comply with such orders, it was in the power of the board, and it was made their duty, to prefer charges against the delinquents and proceed to their trial and removal if found guilty.   With their discretion and judgment as to the sufficiency of the cause for removal, neither this court nor any other has any right to interfere with, control, revise or reverse.   The law has made them the sole judges of the cause, and so long as they proceed in accordance with law their action is final and conclusive.   But, on the assumption that those persons who have been thus removed, never became members of the new police, did not the resolution of October 9 confer upon them the office?   I see no provision of the statute as to the manner of the appointment, or any restriction upon the board prohibiting them from appointing a large number at a time, by resolution.   That resolution, as we have seen, declares that such of the police force as have not been dismissed from the police in conformity to law, be and they are hereby declared to be of the metropolitan police of this city, and entitled to do duty and to be paid as such.

It is apparent from the action of the board that they supposed that some of the old police force had been dismissed not in conformity to law, and all such they declared should be policemen.   They proceeded to appoint a committee to take testimony and ascertain particularly who had been thus dismissed, and to report their names to the board.   It is in proof before me that this committee are now engaged in the discharge of their duties, and I cannot but assume that all who have not been regularly removed, will, under this resolution, be recognized as policemen and put on duty as such.

McDermott v. Board of Police of Metropolitan Police District.

The resolution means this, as I read it. It was said on the argument that such was not the intention of the board in adopting it. I am bound to regard it as meaning what it says; and if the position is sound, which I do not concur in, that these men were not policemen by right of the act, then it may be argued with great force, they were made such by the passage of this resolution. In the view I have taken of this case it is not necessary to decide that point. But is it not a condonation or waiver by the board, of any neglect or violation of duty by these men, of which it was supposed they had been guilty? The board has the power to say whether they will proceed to try and remove these men, or will forgive the offense and place them on duty. It seems to me that they have said this by the adoption of this resolution, if I correctly understand its purport and meaning, and that the persons therein referred to were acquitted by the board of any previous offense, if any had been committed. I am at a loss to give any other meaning or effect to this action of the board.

If I am correct, therefore, in either of the positions, that the policemen removed, upon whom personal notice was not served, and against whom charges were not preferred under oath, were not removed and still continue policemen; or, if they never were policemen under the act until appointed, and if they were appointed by the action of the board on the 9th of October, it follows that the full number authorized by law and the action of the board of supervisors, are now in office, and that the board of police cannot legally appoint any more, beyond the number thus authorized.

The plaintiff prays for an injunction restraining such appointments, which he says are threatened, on the ground that, as a tax-payer, he will be charged with a portion of the moneys to be raised to pay the salaries of the persons so appointed. If the number authorized by law is now in office, additional appointments beyond that number would be simply void, and confer no right or title to the office upon the appointee, or any claim for salary or compensation for services rendered in pursuance of such appointment.

The plaintiff cannot, therefore, upon his own showing, by any possibility be damnified, and his claim for an injunction to restrain an act which can do him no injury, is untenable.

The motion for an injunction is therefore denied.

[NEW YORK SPECIAL TERM, December 2, 1857. *Davies*, Justice.]